CLARK ANDERSON,              )
                                     )
           Plaintiff,         )
                                     )
       v.                 )     No. 04 C 5755
                                     )
THE FOSTER GROUP,        )     Judge Rebecca R. Pallmeyer
                                     )
           Defendant.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

From January 2000 until June 2004, Clark Anderson ("Plaintiff"), an African-American, was employed by The Foster Group ("Defendant"), an information technology consulting company owned and operated by African-Americans. On June 25, 2004, Defendant terminated Plaintiff for the stated reason of insubordination after Plaintiff refused to meet with one of his superiors and then hung up the phone on him. In this action, Plaintiff claims that Defendant discriminated against him on the basis of his race and on the basis of what he claims is a disability resulting from a herniated disc in his back. Plaintiff further claims that his termination was a product of retaliation. Plaintiff now sues Defendant for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* (Count I); retaliation for complaints of race discrimination under Title VII (Count II); disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.* (Count III); retaliation for complaints of disability discrimination in violation of the ADA (Count IV); and retaliatory discharge under Illinois law (Counts V, VI, and VII). Defendant has moved for summary judgment on all counts. For the reasons explained below, the court grants Defendant's motion as to Plaintiff's federal law claims (Counts I, II, III, IV, and VII). Plaintiff's state law claims (Counts V and VI) are dismissed without prejudice.

## BACKGROUND[1]

---

[1]     The facts presented here are drawn from the parties' Local Rule 56.1 Statements:
(continued...)

## A.    Plaintiff's Employment Prior To His July 2003 Medical Leave

Plaintiff, who is a high school graduate and took some classes at the Computer Learning Center in the early 1980's, began working for Defendant as a Senior Consultant in January 2000. (Def. LR 56.1 Stmt. ¶¶ 2, 7-8.)[2]  Plaintiff's initial salary was $65,000 a year; by the time he was terminated on June 25, 2004, Plaintiff was earning a salary of $75,354.  (*Id.* ¶¶ 3, 5.)  During the time Defendant employed Plaintiff, he never experienced a decrease in pay.  (*Id.* ¶ 6.)

Defendant uses one set of job titles internally and another set in its dealings with its clients. (*Id.* ¶ 26.)  Internally, "Senior Consultants" report to "Managers" or "Directors," and "Managers" or "Directors" report to "Partners."  (Pl. LR 56.1 Stmt. ¶ 4.)  Though the parties disagree about Plaintiff's internal job title at certain points during his employment, it is undisputed that when he began working for Defendant, Plaintiff's internal title was Senior Consultant, and his duties included supervising two other employees.  (Def. LR 56.1 Stmt. ¶ 28; Pl. LR 56.1 Stmt. ¶ 2.)  Defendant claims that Plaintiff's title never changed, (Def. LR 56.1 Stmt. ¶ 23), but the portion of Plaintiff's deposition to which Defendant cites establishes only that Plaintiff had the title Senior Consultant at some point, and does not make clear how long Plaintiff held that title.  (*See* 4/8/05 Anderson Dep. at 169, Tab A to Def. LR 56.1 Stmt.)  Although Plaintiff did testify that his title was Senior

---

[1](...continued)
Defendant's Local Rule 56.1 Statement of Material Facts ("Def. LR 56.1 Stmt."), Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts ("Pl. LR 56.1 Resp."), Plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl. LR 56.1 Stmt."), and Defendant's Response to Plaintiff's Local Rule 56.1 Statement ("Def. LR 56.1 Stmt.").  In considering the parties' factual materials, the court incorporates its March 30, 2007 ruling on Defendant's motion to strike. In that motion, Defendant contested, in part, those statements of fact that Plaintiff supported only by his own affidavit.  Defendant again raises this argument within many of its responses to Plaintiff's statements of fact.  As stated in the court's March 30, 2007 ruling, otherwise admissible statements in Plaintiff's affidavit or deposition are sufficient, even if "self-serving," to create a dispute of fact. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003).

[2]      In many of his responses to Defendant's statement of material facts, Plaintiff failed to cite to record evidence.  Unless Plaintiff's denials are supported by record evidence cited in Plaintiff's own statement of material facts, the court deems Defendant's statements admitted.  *See* N.D. ILL. LOC. R. 56.1(b).

Consultant, (*id.*), he also asserts that his internal title was Manager for several years and that, as Manager, he supervised from six to eleven employees. (Pl. LR 56.1 Resp. ¶ 28; Pl. LR 56.1 Stmt. ¶ 5.) In support, Plaintiff cites to a December 6, 2000 Staff Evaluation Form that refers to his job title as of that date as Manager. (12/6/00 Staff Evaluation Form, Tab KK to Pl. LR 56.1 Stmt.) A Staff Evaluation Form dated October 17, 2001 also lists Plaintiff as Manager, (10/17/01 Staff Evaluation Form, Tab LL to Pl. LR 56.1 Stmt.), but Staff Evaluation Forms completed in each of the next two years identify Plaintiff as a Senior Consultant. (11/22/02 Staff Evaluation Form, Tab MM to Pl. LR 56.1 Stmt.; 11/5/03 Staff Evaluation Form, Tab NN to Pl. LR 56.1 Stmt.)

As part of its technology consulting business, Defendant had a contract to provide services to the Cook County Bureau of Health. (Def. LR 56.1 Stmt. ¶ 24.) When Defendant hired Plaintiff in January 2000, his external or "client" title was "Manager of Network Services" for Cook County Hospital; in April 2000, Defendant assigned Plaintiff the client title of "Associate Director of Network Services." (*Id.* ¶ 30.) Plaintiff characterizes this assignment as a promotion because his salary increased at the same time from $65,000 to $69,000 and, in a letter dated May 25, 2000, John Foster, Defendant's Managing Partner, congratulated Plaintiff on his "new position." (*Id.* ¶ 30; 4/08/05 Anderson Dep. at 176-78; 5/25/00 Letter, Tab CC to Pl. LR 56.1 Stmt.)[3] It is undisputed that Plaintiff supervised between six and eleven employees in this position. (Pl. LR 56.1 Stmt. ¶ 5.) Both Plaintiff's December 6, 2000 and October 17, 2001 Staff Evaluation Forms, which list Plaintiff's internal title as Manager, also list his client title as "Associate Director of Networking Services." (12/6/00 Staff Evaluation Form; 10/17/01 Staff Evaluation Form.) The parties agree that this client title was reassigned to other employees, Haitao Yao and Donna Hart, in late 2000, though Plaintiff claims he was not informed at that time that his duties in that position were reassigned as well.

---

[3]      While both parties agree that Defendant extended the client title of "Associate Director of Network Services" to Plaintiff in April 2000, (Def. LR 56.1 Stmt. ¶ 30), the letter documenting this change in position indicates that it was not effective until June 1, 2000. (5/25/00 Letter, Tab CC to Pl. LR 56.1 Stmt.)

(Def. LR 56.1 Stmt. ¶¶ 30-31; Pl. LR 56.1 Stmt. ¶ 11.)[4]   The parties dispute whether this reassignment of Plaintiff's title and duties in late 2000 constituted a demotion.  Defendant contends that Plaintiff was never demoted because his pay was never reduced.   Although Plaintiff characterizes the reassignment as a demotion, (Pl. Aff. ¶ 6, Tab AAA to Pl. LR 56.1 Stmt.), he does not say what his own client title was after this reassignment, and the court notes that Plaintiff's October 17, 2001 Staff Evaluation Form continued to list Plaintiff as the Associate Director of Networking Services.  Plaintiff's November 22, 2002 Staff Evaluation Form lists his client title as "Network and Server Services," and his November 5, 2003 Staff Evaluation Form lists his client title as "Server Analyst."  (11/22/02 Staff Evaluation Form; 11/5/03 Staff Evaluation Form.)

Plaintiff has not explained exactly when or how he became aware of the purported demotion.  He asserts, however, that in February 2001, Mike Sommers, a Partner who at times gave Plaintiff assignments, told him that he would have to share his position with Donna Hart.  (Pl. LR 56.1 Stmt. ¶ 12.)[5]  Plaintiff also asserts that in February 2001, Sommers admitted to Plaintiff that he had told Plaintiff's subordinates to ignore his attempts to supervise them.  (*Id.* ¶ 13.)  And, Plaintiff claims, for several months in 2001, Sommers gave him no assignments, with the result that Plaintiff was forced to search for and create work for himself.  (*Id.* ¶ 14.)  According to Plaintiff, by mid-2001, Sommers began giving him "entry-level, desk-top [sic] assignments."  (*Id.*)  From early 2001 on, Plaintiff's duties included taking computer equipment to outlying clinics of the Cook County

---

[4]    Yao has a bachelor of science and master's degree in engineering from Zhejiang University in China, and a master's degree in engineering from the Illinois Institute of Technology. (Def. LR 56.1 Stmt. ¶ 32.)  The parties do not provide information on Hart's credentials or qualifications.

[5]    Given Plaintiff's assertion that his client title of Associate Director of Networking Services was reassigned to Haitao Yao and Donna Hart in late 2000, it is not clear to the court what position Sommers was referring to when he purportedly told Plaintiff, in February 2001, that Plaintiff would have to share his position with Donna Hart.

Hospital and resolving problems on personal computers. (Def. LR 56.1 Stmt. ¶ 34.)[6] It is undisputed that, by late 2001, Plaintiff was no longer supervising any employees. (Pl. LR 56.1 Stmt. ¶ 16.) Although Plaintiff claims (and his October 2001 Staff Evaluation Form reflects) that he continued to hold the internal title of Manager, Plaintiff asserts that in October 2001, Sommers began treating him as if he were a desktop computer technician and told him to take directions from Winslow Redmond, an employee Plaintiff had previously supervised. (*Id.* ¶ 17.)

In March 2002, Sommers assigned Plaintiff to take a one-week class in systems engineering. (*Id.* ¶ 18.) Plaintiff stopped taking the class before its completion because, he asserts, systems engineering was really no more than data entry; thus, in completing the class, he would "appear to be acquiescing to [his own] . . . demotion." (*Id.*) In the fall of 2002, Sommers frequently sent Plaintiff to outlying clinics to perform desktop work, such as installing computer systems. (*Id.* ¶ 20.) In 2002, Plaintiff was also assigned to work under the supervision of Henry O'Neal, an African-American, who had the rank of a Director and therefore reported to a Partner. (Def. LR 56.1 Stmt. ¶¶ 22, 36.) While under O'Neal's supervision, Plaintiff worked on the "time and attendance" project, which involved deploying several kinds of devices and software to meet clients' needs for managing their employees' time and attendance records, and ensuring that the devices worked. (*Id.* ¶¶ 37-38; Howard Dep. at 34-36.)[7] As stated above, Plaintiff's November 2002 Staff Evaluation Form reflected that, as of that date, his internal title had been reduced from Manager to Senior Consultant, that his client title was Network and Server Services for Cook County Hospital, and that he no longer supervised any employees. (Pl. LR 56.1 Stmt. ¶ 21; 11/22/02

---

[6]     Plaintiff claims that he performed such tasks on his own initiative and not because they were assigned to him, but he cites no support in the record for this assertion. (Pl. LR 56.1 Resp. ¶ 34.)

[7]     The "time and attendance" project is also referred to as the "ASC" project; "ASC" refers to a vendor involved with the project. (Howard Dep. at 29; 7/30/03 Email, Tab Q to Pl. LR 56.1 Stmt.)

Evaluation Form.)

### B. Plaintiff's Complaint Of Race Discrimination In Pay

Plaintiff claims that in late 2000, he complained to Russell Pike, Defendant's Chief Operating Officer, about race discrimination in pay. (Pl. LR 56.1 Stmt. ¶ 9.) Specifically, as the result of information he received from Stephanie Osabouhien, a Senior Consultant, Plaintiff came to believe that two of his peers who are both white males, Tony Bullaro, a Manager, and Richard Balluff, were earning over $100,000.[8] (*Id.* ¶ 6.) In fact, however, it is undisputed that both Bullaro and Balluff were earning only $78,000 as of May 2001. (*Id.* ¶¶ 7-8.) Plaintiff asserts that when he complained to Pike in 2000, Pike instructed him to take his complaint to Mike Sommers, who had the rank of Partner. (*Id.* ¶ 9.) Plaintiff claims that he did speak to Sommers about the matter several weeks later, and that Sommers told him to talk to Mr. Foster, Defendant's owner. (*Id.* ¶ 10.) Pike testified that neither Plaintiff nor any other employee ever complained to him about race discrimination, (Pike Dep. at 56, Tab D to Def. LR 56.1 Stmt.), and there is no evidence that Plaintiff ever spoke to Mr. Foster.

### C. Plaintiff's Herniated Disc And Resulting Limitations

In October 2002, Plaintiff developed back pain. (Pl. LR 56.1 Stmt. ¶ 41.)[9] On January 28, 2003, Dr. Sunil Patel diagnosed Plaintiff as suffering from a herniated disc, a condition he claims is a disability. (4/8/05 Anderson Dep. at 271-72; Def. LR 56.1 Stmt. ¶ 40; Pl. LR 56.1 Stmt. ¶ 44.) Plaintiff's herniated disc caused acute low back pain with pain radiating down his legs to his feet.

---

[8] The court is uncertain of Balluff's position. His November 2001 Staff Evaluation Form lists Balluff's position as Senior Consultant, but in a letter offering him the job, Defendant states that Balluff was being offered the position of "Integration Manager." (11/14/01 Staff Evaluation, Tab EE to Pl. LR 56.1 Stmt.; 9/18/00 Letter, Tab DD to Pl. LR 56.1 Stmt.)

[9] Plaintiff claims to have hurt his back in a car accident. (Pl. LR 56.1 Stmt. ¶ 41.) Plaintiff was in fact involved in one automobile accident in May 2000, (Def. LR 56.1 Stmt. ¶ 33), and another in October 2002, (*id.* ¶ 35), but according to his medical records, he hurt his back by "standing up from the seated position as he attempted to get out of his car." (2/4/03 Initial Physical Therapy Evaluation, Tab J to Pl. LR 56.1 Stmt.) This discrepancy is not material to this motion.

(Pl. LR 56.1 Stmt. ¶ 43.)  An evaluation dated February 21, 2003 noted degeneration of Plaintiff's L4-L5 disc with some "minimal bulging."  (2/21/03 Neurological Evaluation, Tab K to Pl. LR 56.1 Stmt.)  In notes of an office visit on March 5, 2003, Dr. Patel confirmed the herniated disc diagnosis.  (Pl. LR 56.1 Stmt. ¶ 48.)  In May 2003, Dr. Patel concluded that Plaintiff's symptoms had improved as a result of physical therapy.  (*Id.* ¶ 51.)  By July 2003, however, Dr. Patel imposed restrictions on Plaintiff's activities; specifically, Plaintiff was not permitted to lift more than five pounds at a time, or to stand for more than fifteen minutes at one time or more than twenty minutes in an hour.  (Def. LR 56.1 Stmt. ¶ 42; 7/25/03 Letter from Sunil Patel, M.D., Ex. L to Def. LR 56.1 Stmt.)  Despite his condition, Plaintiff is able to talk, eat, sleep, relieve himself, breathe, and have sexual intercourse. (Def. LR 56.1 Stmt. ¶ 41.)[10]

During the early months of 2003 when he was first diagnosed with a herniated disc, Plaintiff's duties included setting up computers for hospital staff.  (Pl. LR 56.1 Stmt. ¶ 50.)  Plaintiff acknowledges that an "essential function" of his job was setting up end-user devices, (Def. LR 56.1 Stmt. ¶ 43), which required him to lift computers to and from a cart.  These devices exceeded Plaintiff's five-pound lifting restriction:  monitors weighed twelve pounds, PC's weighed from ten pounds to fifteen pounds, and printers weighed close to thirty-two pounds.  (*Id.* ¶ 44.)  Plaintiff claims that his own co-workers or Cook County employees always volunteered to help him with this lifting.  (Pl. LR 56.1 Stmt. ¶ 50.)  He also asserts, however, that carrying equipment was not a part of his duties at all and that he was mainly working on tasks such as fighting computer viruses, (*id.* ¶ 89), though he does remember carrying "thin" monitors on a couple of occasions in late 2002 and early 2003.  (4/20/05 Anderson Dep. at 544.)  The court concludes that it is undisputed that at least

---

[10]     Defendant also asserts that Plaintiff was able to "work" despite his herniated disc. Plaintiff disagrees and asserts that he could not work without reasonable accommodation.  (Pl. LR 56.1 Resp. ¶ 41.)  Plaintiff acknowledged in his deposition that he was able to "go to work" despite his herniated disc; he did not identify the work-related tasks he was able to accomplish with or without reasonable accommodation.  (4/8/05 Anderson Dep. at 275.)

some lifting was required of Plaintiff during the time period preceding his leave of absence. Plaintiff's work also required him to stand in order to work with the equipment, and, Defendant notes, "he could not have accomplished these duties from a chair." (Def. LR 56.1 ¶¶ 46-47.)[11] Plaintiff insists, however, that his duties did not require him to stand for more than fifteen minutes without sitting down occasionally. (PL. LR 56.1 Stmt. ¶ 49.)[12] With the use of a medicated patch, which made Plaintiff's self-described "miserable pain" manageable, Plaintiff was able to stand for fifteen minutes and sit for up to an hour. (Def. LR 56.1 Stmt. ¶¶ 57, 59; 4/8/05 Anderson Dep. at 275-77.)

Russell Pike, Defendant's Chief Operating Officer, did not believe that Plaintiff could perform his responsibilities with the five-pound limitation imposed by Dr. Patel in July 2003. (Def. LR 56.1 Stmt. ¶ 48; Pike Dep. at 151, Tab D to Def. LR 56.1 Stmt.) Pike testified that Defendant was unable to reassign Plaintiff to another position because no other employee who might replace Plaintiff was performing a job that Plaintiff could fulfill, given his limitations. (Def. LR 56.1 Stmt. ¶ 49; Pike Dep. at 149-50.) It is undisputed that Defendant could not provide an accommodation short of hiring someone to assist Plaintiff. (Def. LR 56.1 Stmt. ¶¶ 50-51.)[13] Defendant asserts that

it would not have been practicable to offer Plaintiff the aid of a board or piece of plastic so that

---

[11] Plaintiff refuses to agree with this statement based on Defendant's failure to state who "he" is and what "duties" Defendant is referring to, but the court finds Defendant's statement sufficiently clear in context. Because Plaintiff has not cited any evidence that rebuts Defendant's statement, the court deems Plaintiff to have admitted that he could not have accomplished his duties in setting up end-user devices from a chair. (See Pl. LR 56.1 Resp. ¶ 47.)

[12] Defendant disagrees on the basis that Plaintiff admitted that he would have to do some standing and lifting in his job. (Def. LR 56.1 Resp. ¶ 49.) The court does not find that admission inconsistent with Plaintiff's assertions regarding the amount of standing involved.

[13] Plaintiff claims that he cannot respond to Defendant's statement that there was no accommodation available short of hiring someone to assist him because "no time frame is stated," (Pl. LR 56.1 Resp. ¶ 50); but, it is clear, in context, that Defendant's statement regarding an available accommodation relates to the time preceding Plaintiff's medical leave in July 2003. (Def. LR 56.1 Stmt. ¶ 50.) Because Plaintiff has not otherwise explained his disagreement or provided evidence in response to this statement, the court deems it admitted.

Plaintiff could slide equipment off of a cart, rather than lifting it. (*Id.* ¶ 51.)[14] Dan Howard, a Director for the Cook County Project, explained that even with the aid of a board, some lifting of the equipment would be required to put the equipment on the board or the cart; O'Neal explained that sliding equipment on a board would create a risk that something could tip over in the process. (Howard Dep. at 147; O'Neal Dep. at 87-88, Tab C to Def. LR 56.1 Stmt.)  As a result, Defendant contends, Pike suggested to Plaintiff that he take a medical leave until his condition improved. (Def. LR 56.1 Stmt. ¶¶ 52-53, 55.)  Plaintiff disputes that the option of a medical leave was merely a suggestion and claims that he was forced to take the leave.  (Pl. LR 56.1 Stmt. ¶ 22; Pl. Aff. ¶ 18.) There is substantial evidence that the leave was, in fact, involuntary: in a July 28, 2003 letter, Mike Sommers wrote to Plaintiff that Defendant "must insist that [he] take an unpaid leave until [his] health issues, as documented by Dr. Patel, have been completely resolved."  (Pl. LR 56.1 Stmt. ¶ 53; 7/28/03 Letter, Tab O to PL. LR 56.1 Stmt.)  Sommers further explained that the "restrictions indicated [would] prevent [Plaintiff] from adequately performing [his] day-to-day job responsibilities and furthermore, the nature of [his] work could jeopardize and/or hinder [his] full recovery."  (7/28/03 Letter.)   In a letter dated August 1, 2003, Pike wrote to Plaintiff that it was Defendant's understanding that Plaintiff was "in complete agreement with The Foster Group's decision to place [him] on an unpaid medical leave."  (8/1/03 Letter, Tab AA to Pl. LR 56.1 Stmt.)  But Dan Howard, who was at that time the Director for all of Defendant's information technology work related to the Cook County Bureau of Health, admits that before going on medical leave, Plaintiff told Howard that he did not believe he needed to go on leave, and, in a July 30, 2003 e-mail, Plaintiff reiterated that he did not ask for the medical leave and would take it only if he qualified for "short term disability" coverage under his insurance.  (Pl. LR 56.1 Stmt. ¶ 54; Howard Dep. at 96; 7/30/03 Email, Tab Q

---

[14]     Plaintiff disagrees with Defendant's statement that it would not have been practicable to provide this type of accommodation, but he cites no evidence to rebut it.  (*See* Pl. LR 56.1 Resp. ¶ 51.)

to Pl. LR 56.1 Stmt.)  Though the parties do not clarify whether Plaintiff eventually qualified for "short term disability," Plaintiff did take a leave of absence beginning in July 2003 and continuing until his return to work in October 2003.[15]  (Def. LR 56.1 Stmt. ¶¶ 53, 55.)

On July 31, 2003, Dr. Patel noted in a follow-up visit that Plaintiff was considering surgery as "a last resort."  (Pl. LR 56.1 Stmt. ¶ 55.)  An MRI taken on August 26, 2003, during Plaintiff's leave of absence, confirmed that Plaintiff had mild degenerative disc disease at the L4-L5 location. (*Id.* ¶ 57; 8/26/03 St. James Hospital Report, Tab P to Pl. LR 56.1 Stmt.)  Dr. Patel's notes of September 4, 2003 reflect that Plaintiff was still unable to work due to his back pain and that his condition had not improved.  (Pl. LR 56.1 Stmt. ¶ 59.)[16]  On September 18, 2003, Plaintiff began a course of physical therapy two to three times a week for his lower back pain.  (*Id.* ¶ 60.)  On October 13, 2003, Dr. Patel prescribed additional physical therapy for Plaintiff and instructed Plaintiff to attend therapy three times per week for four weeks.  (*Id.* ¶ 61.)  Plaintiff admits that although the physical therapy did not return his lifting abilities to normal, it did improve those abilities.  (Pl. LR 56.1 Resp. ¶ 58.)  Dr. Patel gave Plaintiff permission to return to work beginning on October 22, 2003, restricting him only to lifting no more than forty pounds and standing for no more than several hours.  (Pl. LR 56.1 Stmt. ¶ 62; Def. LR 56.1 Stmt. ¶ 56.)

On October 15, 2003, just before his return to work, Plaintiff informed Pike that he understood he would have to do "some lifting and standing" in his job and would be able to meet those responsibilities, but that he would need to continue his treatment.  (Def. LR 56.1 Stmt. ¶ 54;

---

[15]     In its brief in support of summary judgment, Defendant claims that Plaintiff did in fact receive disability benefits while on medical leave, and was not on "unpaid" leave.  (Def. Mem. at 8 n.4 (citing Pike Dep. at 137).)  Whether or not Plaintiff received benefits while on leave is not material to the court's decision here.

[16]     Plaintiff asserts that on this same day Dr. Patel stated that Plaintiff "could have performed the essential functions of his job with accommodations that his managers admitted were reasonable[,]" but no such statement from Dr. Patel appears in the evidence to which Plaintiff cited. (*See* 9/4/03 Notes, Tab S. to Pl. LR 56.1 Stmt.)

10/15/03 Letter, Tab M to Def. LR 56.1 Stmt.)  In a similar letter to Howard dated October 23, 2003, Plaintiff referred to and requested accommodation under the ADA in the form of a schedule that allowed him to work 7:00 a.m. to 3:30 p.m. so that he could get to his physical therapy appointments by 5:00 p.m.  (Pl. LR 56.1 Stmt. ¶ 64; 10/23/03 Letter, Tab X to Pl. LR 56.1 Stmt.)  In this letter, Plaintiff also informed Howard that he expected to need such a schedule for the next six months, until his doctor reevaluated his physical therapy needs.  (Pl. LR 56.1 Stmt. ¶ 65; 10/23/03 Letter.)  In January 2004, Patrick Sweeney, M.S., an employee of Midwest Minimally Invasive Spine Specialists, confirmed that Plaintiff's MRI at that time possibly showed a "small disc herniation."  (Pl. LR 56.1 Stmt. ¶ 69; 1/19/04 Letter, Tab BBB to Pl. LR 56.1 Stmt.)[17]

According to Plaintiff, at some point after he returned from his leave of absence, he learned—though it is not clear how—that Defendant wanted to change his schedule from the hours he worked before his leave of absence, which would have allowed him to receive therapy in the afternoon, to hours that would have precluded therapy; thus, in March 2004, Plaintiff complained to Dan Howard that Defendant was attempting to force him to work a schedule that would prevent him from getting physical therapy for his back condition.  (Pl. LR 56.1 Stmt. ¶ 25; Pl. Aff. ¶¶ 24, 28.)[18]  The parties agree that Defendant preferred for Plaintiff to work during regular business hours when clients and Defendant's staff were available, as opposed to the schedule Plaintiff had routinely worked, which allowed him to start early in the morning and leave earlier in the afternoon.

---

[17]     Sweeney's position is not clear to the court.  While Sweeney's letterhead lists him as "M.S." rather than "M.D.," which is the title listed for two other individuals sharing the same letterhead as Sweeney, Plaintiff calls Sweeney a doctor and refers to him as a "spine specialist." (Pl. LR 56.1 Stmt. ¶ 69.)

[18]     Plaintiff also asserts that in late 2003 and early 2004, Howard repeatedly threatened to change his work schedule in such a way as to prevent Plaintiff from getting to physical therapy in the late afternoon.  (Pl. LR 56.1 Stmt. ¶ 70.)  The letter to which Plaintiff cites makes no reference to any such threats.  (12/5/03 Letter, Tab YY to Pl. LR 56.1 Stmt.)

(Def. LR 56.1 Stmt. ¶ 68.)[19]  Plaintiff contends that he had been able to complete his work successfully using an early morning schedule prior to his medical leave, (Pl. LR 56.1 Stmt. ¶ 26), and he objected to the proposed change in his schedule in a May 5, 2004 e-mail to Sommers, Howard, and Pike.  (*Id.* ¶ 66; 5/5/04 E-mail, Tab Y to Pl. LR 56.1 Stmt.)  In that e-mail, Plaintiff complained that Sommers and Howard were not working with him "to address [his] needs as a person with a disability." (Pl. LR 56.1 Stmt. ¶ 73.)  Though Plaintiff claims that Defendant eventually did change his schedule to one that prevented him from getting therapy in the late afternoon when he began to work at the jail in May 2004, (*id.*),[20] Plaintiff also admits that Defendant ultimately allowed him to continue with a schedule that enabled him to receive therapy in the afternoon, and that Plaintiff did complete his course of physical therapy.  (*Id.* ¶ 68; Def. LR 56.1 Stmt. ¶ 67.)

### D.    Plaintiff's Role Post-Medical Leave

Upon his return to work in October 2003, Plaintiff was only required to work with "thins," which did not require him to lift a full desktop PC, but only involved lifting computer monitors that weighed fifteen to twenty pounds; Plaintiff was also responsible for identifying locations for time clocks, which did not involve any lifting.  (Def. LR 56.1 Stmt. ¶ 60; Pl. LR 56.1 Stmt. ¶ 63.)[21]  Plaintiff claims that his client title was reduced in November 2003 from Network and Server Services to Server Analyst, but he cites no evidence in support of the assertion that this change in his client title

---

[19]    Though Plaintiff does not specify who within Defendant's organization made an effort to change his schedule, in a May 5, 2004 e-mail message sent to Sommers, Howard, and Pike, Plaintiff stated that Sommers and Howard had talked to him about changing his hours.  (5/5/04 E-mail, Tab Y to Pl. LR 56.1 Stmt.)

[20]    It appears to the court that the first time Plaintiff's schedule actually changed was in May 2004 and that Plaintiff's prior complaints were a function of Plaintiff's understanding that Defendant wanted him to work a different schedule from the one to which he was accustomed.  In his statement of material facts, Plaintiff does not specify exactly when this change was imposed or the parameters of the schedule that he was ultimately required to keep.

[21]    Plaintiff disagrees and states that he also deployed other equipment, but he does not cite any evidence in support of this disagreement.  (Pl. LR 56.1 Resp. ¶ 60.)

amounted to a "reduction."  (Pl. LR 56.1 Stmt. ¶ 24.)

While Plaintiff was on medical leave, his old office had been reassigned along with other offices, and, upon his return, Plaintiff was temporarily assigned to a cubicle, though it is not apparent for how long Plaintiff worked there.  (Def. LR 56.1 Stmt. ¶¶ 63-64.)  Plaintiff's office location after he moved out of this temporary cubicle is not clear; Plaintiff admits in response to Defendant's statement of facts that he moved to an office beside that of Maria Strandquist, who was a Senior Consultant, (*Id.* ¶ 64), but Plaintiff nevertheless contends in his own statement of facts that, in May 2004, he was assigned to work in a cubicle among entry-level help desk staff.  (Pl. LR 56.1 Stmt. ¶ 23.)  Regardless of whether or not Plaintiff was assigned to work in a cubicle among help desk staff, Plaintiff admits that "he did not do help desk work."  (Pl. LR 56.1 Resp. ¶ 61.)  Plaintiff also agrees that all of Defendant's "consulting employees," which included Plaintiff, were required to handle "tickets" generated from a help desk software program that Defendant used.  (Pl. LR 56.1 Stmt. ¶ 62.)

Believing that he had been improperly forced to take a leave of absence, Plaintiff filed a complaint with the U.S. Department of Labor ("DOL") no later than October 2003, claiming that Defendant had violated the Family and Medical Leave Act ("FMLA").[22]  Plaintiff amended this complaint in November 2003, adding allegations that Defendant had not reinstated him to the same duties he held prior to his leave of absence.  (Pl. Aff. ¶ 21.)  On November 3, 2003, Plaintiff filed an application for worker's compensation benefits with the Illinois Industrial Commission.  (Def. LR 56.1 Stmt. ¶ 69; Illinois Industrial Commission Application for Benefits, Tab O to Def. LR 56.1 Stmt.)  The following day, he filed a charge of race and disability discrimination against Defendant with the Illinois Department of Human Rights ("IDHR") and the U.S. Equal Employment Equal Opportunity

---

[22]    It is unclear on exactly what date Plaintiff filed this complaint with the DOL.  Plaintiff cites only to his affidavit, which states that Plaintiff filed the complaint in or about September  2003.  (Pl. Aff. ¶ 19.)  Both Plaintiff and Defendant agree, however, that the complaint was filed in October 2003.  (Pl. LR 56.1 Stmt. ¶ 75; Def. LR 56.1 Resp. ¶ 75.)

Commission ("EEOC"). (Def. LR 56.1 Stmt. ¶ 70; 11/4/03 IDHR Charge, Tab P to Def. LR 56.1 Stmt.) In this charge, Plaintiff complained that Defendant was paying him lower wages and bonus payments than it paid similarly-situated Caucasian employees. (11/4/03 IDHR Charge.) Plaintiff also claimed that he requested a reasonable accommodation for his back injury, but that Defendant forced him to take a three-month leave of absence, and that Defendant treated him differently than other Caucasian employees who have taken leaves of absence. (*Id.*) Further, Plaintiff alleged that he was subjected to different terms of employment upon his return from his leave of absence. (*Id.*) Plaintiff received a Notice of Right to Sue from the EEOC on June 2, 2004. (EEOC Notice of Right to Sue, Tab P to Def. LR 56.1 Stmt.)

### E. Plaintiff's Work in 2004 and Alleged Insubordination

According to Plaintiff, during the early months of 2004, Henry O'Neal required Plaintiff to meet with him daily to submit an oral report of his progress on the time and attendance project. (Pl. LR 56.1 Stmt. ¶ 29.)[23] In early 2004, O'Neal also sent Plaintiff to install time and attendance software programs on the computers of hospital personnel. (*Id.* ¶ 31.) Plaintiff claims that during the early months of 2004, when he was performing such work, O'Neal falsely accused him of causing the computers he was working on to malfunction; Plaintiff does not explain the context in which O'Neal made this accusation. (Pl. LR 56.1 Stmt. ¶ 31; Pl. Aff. ¶ 27.)

In a February 20, 2004 e-mail, O'Neal wrote to Plaintiff listing certain work-related priorities. (2/20/04 E-mails, Tab Q to Def. LR 56.1 Stmt.) Plaintiff responded to O'Neal with an e-mail stating: "Also, You don't have the right to determine my job title, I though [sic] this was Mike's and Dan's

---

[23]    Plaintiff claims that O'Neal had meetings just once per week with the other employees he supervised. (Pl. LR 56.1 Stmt. ¶ 30.) Plaintiff bases this assertion solely on his own affidavit. As the court previously stated, it will consider statements of fact made in Plaintiff's affidavit to the extent they meet evidentiary standards. Nothing in Plaintiff's affidavit establishes that Plaintiff has sufficient knowledge to testify about O'Neal's meetings with other employees. The court likewise disregards Plaintiff's characterization as to the lack of respect with which O'Neal spoke to him as compared to other employees.

right." (*Id.*)  In a subsequent e-mail message to Howard (but not to Plaintiff), O'Neal commented that he did not understand Plaintiff's remarks because he had not mentioned Plaintiff's job title. (*Id.*; Howard Dep. at 7-8, Tab B to Def. LR 56.1 Stmt.)  Sommers then e-mailed Howard, O'Neal, and Pike, noting that Plaintiff's reaction was "consistent with [Plaintiff's] level of frustration"; Sommers further characterized Plaintiff's reaction as "aggressive" and asked that O'Neal "continue as normal . . . [t]reat him no better, or no worse than you would anyone else." (2/20/04 E-mails.)  On February 25, 2004, Plaintiff exchanged e-mails with O'Neal again regarding "make-up time" for work hours. (2/25/04 E-mails, Tab R to Def. LR 56.1 Stmt.)  In this e-mail, Plaintiff wrote to O'Neal: "Again, You are not my manager.  I was told by my manager that I work for you on projects.  I have not been given anything in writing saying you are my manager, and if you try to get me to sign something saying you are my manager I will not do this." (*Id.*; Def. LR 56.1 Stmt. ¶ 72.)

On March 3, 2004, Pike wrote Plaintiff a letter as a result of the "various memos that [Plaintiff had] recently submitted to" Sommers, Howard, and O'Neal concerning his work assignments. (3/3/04 Letter, Tab S to Def. LR 56.1 Stmt.; Def. LR 56.1 Stmt. ¶ 73.)  In this letter, Pike stated that "[a]s an employee of The Foster Group you are to take direction from the company's management personnel with respect to performing various duties, tasks, assignments, etc.  This is the expectation for every employee hired by our company." (3/3/04 Letter.)  Pike's letter further stated that "[i]t is considered an act of insubordination for an employee to refuse direction provided by management of The Foster Group or the designated individual assigned by the manager to provide direction to an employee to carry out various duties, tasks, assignments, etc." (*Id.*; Def. LR 56.1 Stmt. ¶ 73.)  In an e-mail exchange on April 28, 2004, Plaintiff wrote to O'Neal that he would "do as [O'Neal says] as long as [he doesn't] give [Plaintiff] any instruction's [sic] on how to handle this users project." (4/20/04 E-mails, Tab T to Def. LR 56.1 Stmt.; Def. LR 56.1 Stmt. ¶ 74.)

In May 2004, O'Neal assigned Plaintiff to assist the desktop staff at the Cook County Jail

at most one day a week.  (Pl. LR 56.1 Stmt. ¶ 33; Def. LR 56.1 Resp. ¶ 33.)[24]  Plaintiff claims that

he had nothing to do while assigned to the jail.  (Pl. LR 56.1 Stmt. ¶ 33.)[25]  O'Neal testified,

however, that Plaintiff was sent to the jail because he had "some available time" and the IT director

at the facility was asking for help.  (O'Neal Dep. at 108-09.)  Around the same time, Defendant

assigned Plaintiff to work one day a week at the Juvenile Temporary Detention Center.  (Def. LR

56.1 Stmt. ¶ 75.)  Plaintiff insists that Defendant had not assigned an employee to work at the

juvenile center for fifteen years, but Winslow Redmond testified that he had worked at the juvenile

center as a part of his responsibilities as a Senior Consultant, a position he has held since 1993.

(Pl. LR 56.1 Stmt. ¶ 33; Def. LR 56.1 Resp. ¶ 33; Redmond Dep. at 74, Ex. to Def. LR 56.1 Resp.)

Defendant terminated Plaintiff before his assignment at the juvenile center began.  (Def. LR 56.1

Stmt. ¶ 75.)

On an activity report for May 6, 2004, Plaintiff states that he called O'Neal to ask about a

particular testing class; O'Neal did not know about the class and told Plaintiff to ask Dan Howard,

but Plaintiff "decided to wait for [Howard] to call [him]."  (5/6/04 Daily Activity Report, Tab U to Def.

LR 56.1 Stmt.; Def. LR 56.1 Stmt. ¶ 76.)  Also in May 2004, Plaintiff submitted a time sheet for 38.9

hours.  (Def. LR 56.1 Stmt. ¶ 77.)  O'Neal told Plaintiff that his time sheet needed to account for 40

hours.  (*Id.* ¶ 78.)  According to Defendant, O'Neal's request that Plaintiff change his time sheet was

not a request that Plaintiff "pad" his time; instead, it was merely a request that "he account for the

missing time with benefit time if he had it" to ensure that the time record was accurate.  (*Id.* ¶ 79;

Howard Dep. at 121; O'Neal Dep. at 124; 5/4/04 E-mails, Tab V to Def. LR 56.1 Stmt.)  Plaintiff

---

[24]      Plaintiff asserts that he was assigned to work at the jail one to two days a week, (Pl. LR 56.1 Stmt. ¶ 33), but the testimony that Plaintiff cites is consistent with Defendant's assertion that Plaintiff worked at the jail "not more than one day a week."  (O'Neal Dep. at 109; 4/20/05 Anderson Dep. at 553.)

[25]      Plaintiff claims to have e-mailed Sommers and Howard on May 24, 2004 stating that he did not want to work at the jail, but the e-mail that Plaintiff cites makes no mention of working at the jail.  (Pl. LR 56.1 Stmt. ¶ 34; 5/24/04 E-mail, Tab VV to Pl. LR 56.1 Stmt.)

viewed O'Neal's request differently and wrote an e-mail to Pike, Howard, O'Neal and John Foster on May 4, 2004, stating that O'Neal had instructed him to falsify his time record. (Pl. LR 56.1 Stmt. ¶ 78; 5/4/04 E-mails.) O'Neal responded to Plaintiff's e-mail, explaining that the problem with the time sheet was that Plaintiff needed "to report at least 40 hours," which did not need to be 40 hours worked but could "be worked or time off." (5/4/04 E-mails.)

Plaintiff filed his second charge of discrimination with the IDHR and EEOC on June 23, 2004. (Def. LR 56.1 Stmt. ¶ 81; 6/23/04 IDHR Charge, Tab W to Def. LR 56.1 Stmt.) In this charge, Plaintiff complained that he had been discriminated against on the basis of his race when Defendant moved him to sit with less senior, less experienced, entry-level consultants, and directed him to work at a second client location for at least two days a week in addition to performing his duties at the present client location. (Pl. LR 56.1 Stmt. ¶ 74; 6/23/04 IDHR Charge.) Plaintiff further complained that this same conduct by Defendant constituted retaliation for his previous charge of race discrimination with the EEOC. (6/23/04 IDHR Charge.)

On June 25, 2004, O'Neal requested that Plaintiff send him a list each day of certain people he spoke with regarding the time and attendance project. (Def. LR 56.1 Stmt. ¶ 82; 6/25/04 E-mails, Tab X to Def. LR 56.1 Stmt.) Plaintiff responded that he would do so "[o]nly if [O'Neal] sent him the e-mails of all other employee's [sic] who are required to, and are doing the exact same thing." (Def. LR 56.1 Stmt. ¶ 83; 6/25/04 E-mails.) Subsequently, O'Neal called Plaintiff and asked Plaintiff to meet with him regarding the time and attendance project, but Plaintiff hung up on O'Neal. (Def. LR 56.1 Stmt. ¶ 84.) Plaintiff does not dispute that he hung up on O'Neal or that he refused to meet with O'Neal. (*Id.*; Pl. LR 56.1 Resp. ¶ 86.) In response to Plaintiff's refusal to attend the meeting with O'Neal, Pike called a meeting to discuss the matter. (Pl. LR 56.1 Stmt. ¶ 82.) Plaintiff arrived one hour late for this meeting with Pike. (*Id.*) Later that day, Pike signed a "Separation Notice" terminating Plaintiff for insubordination. (Def. LR 56.1 Stmt. ¶ 4; 6/25/04 Separation Notice, Tab I to Def. LR 56.1 Stmt.)

O'Neal testified that Plaintiff was fired for insubordination for refusing to meet with him. (O'Neal Dep. at 42.) Pike likewise testified that Plaintiff was fired for "not responding to a request given directly to him by his management," namely that Plaintiff "had been contacted, requested to attend the meeting with Henry O'Neal, refused to, subsequently hung up the phone, and did not show up for the meeting requested." (Pike Dep. at 14-16.) On June 30, 2004, after Plaintiff's firing, he amended his June 23, 2004 charge of discrimination to include a claim that his termination was motivated by his race and by retaliation. (Def. LR 56.1 Stmt. ¶ 89; 6/30/04 Amendment to IDHR Charge, Tab W to Def. LR 56.1 Stmt.)

Plaintiff contends that Defendant had not charged him with insubordination on any occasion prior to firing him, (Pl. LR 56.1 Stmt. ¶ 81), though he admits that on a prior occasion, Howard had accused him of failing to complete a project despite being asked repeatedly to do so by Henry O'Neal. (*Id.*) Plaintiff also asserts that other employees failed to attend meetings but were not fired. He notes that in 2000 and the following years, Sommers and Kevin Lane, who had the rank of Partner, held mandatory monthly staff meetings and maintained attendance records for these meetings. (*Id.* ¶ 79.)[26] Plaintiff characterizes poor attendance at the meetings as Sommers' "pet peeve"; Lane's testimony confirms that Sommers heavily encouraged attendance at the meetings, and that he had "informal conversations" with employees who failed to attend. (*Id.* ¶¶ 79-80; Lane Dep. at 89-90.) Plaintiff asserts that Winslow Redmond had missed about fifty percent of the meetings from January 2002 through June 2004. (*Id.* ¶ 83.) While the attendance records Plaintiff has provided do not account for every monthly meeting between January 2002 and June 2004, there is evidence that Winslow Redmond, who is also African American, (The Foster Group Personnel Roster, Ex. K to Def. LR 56.1 Stmt.), missed a number of the monthly meetings and was

---

[26]     Kevin Lane's testimony, cited by Plaintiff, does not actually establish that the meetings were mandatory, but other evidence in the record supports that assertion. (*See* Lane Dep. at 92, Tab B to Pl. LR 56.1 Stmt; 4/20/05 Anderson Dep. at 538; O'Neal Dep. at 59.)

not disciplined for his absences.  (Pl. LR 56.1 Stmt. ¶ 85.)  In fact, Defendant admitted that no employee was subject to discipline for a failure to attend monthly meetings.  (*Id.*)

In Plaintiff's view, Haitao Yao also acted insubordinately and was not disciplined.  According to Plaintiff, around late 2000, Plaintiff instructed Yao that he was not to work on the servers at certain times because it was causing problems with the servers, yet Yao continued to do so.  (Pl. LR 56.1 Stmt. ¶ 84; 4/20/05 Anderson Dep. at 541-42.)  Plaintiff reported this insubordination to Lane, but Lane did not discipline Yao.  (Pl. LR 56.1 Stmt. ¶ 84; 4/20/05 Anderson Dep. at 542-43.)  Plaintiff has admitted, however, that his client title of Associate Director of Network Services was reassigned to Yao in late 2000, so the court is uncertain that Yao was in fact subordinate to Plaintiff at the time of the incident.  (Pl. LR 56.1 Resp. ¶ 31.)

According to Defendant, Andrew Riha, a Caucasian who formerly worked for Defendant as a consultant, was, like Plaintiff, fired for insubordination in October 2002 due to his failure to comply with management's request that he spend a certain percentage of time performing a specific type of work, and due to his general poor performance.  (Def. LR 56.1 Stmt. ¶ 88; 10/9/02 Letter, Tab Y to Def. LR 56.1 Stmt.)[27]  It is undisputed that Riha was counseled by multiple superiors regarding his insubordination before his firing.  (Pl. LR 56.1 Stmt. ¶ 86.)  Plaintiff claims that he did not receive such counseling before his discharge, (*Id.* ¶ 87); Defendant asserts that Plaintiff was in fact counseled regarding insubordination first in Pike's March 3, 2004 letter, which directed Plaintiff to take direction from Defendant's management personnel, and, second, at a March 3, 2004 meeting during which Pike went over the letter "paragraph by paragraph."  (Def. LR 56.1 Resp. ¶ 87.)

Finally, Plaintiff admitted in his deposition that he does not believe that Pike or O'Neal had prejudiced or racist feelings towards him.  (4/8/05 Anderson Dep. at 252-53.)  Plaintiff also asserts that if he had the chance, he "would have done everything they wanted."  (5/11/05 Anderson Dep.

---

[27]     Plaintiff asserts that Riha was not fired for insubordination but for looking at pornography, but he cites no support for this assertion.  (Pl. LR 56.1 Resp. ¶ 88.)

at 570.)

## DISCUSSION

Defendant moves for summary judgment on all of Plaintiff's claims. Defendant contends that Plaintiff's claim of race discrimination is time-barred, and that Plaintiff's claim of retaliation for his complaints about race discrimination is also largely time-barred and, to the extent it is not, lacks support in the record. Defendant further argues that Plaintiff does not suffer from a disability under the ADA and that there is no evidence that Defendant failed to accommodate any claimed disability. Finally, Defendant contends that there is no evidence that Defendant retaliated against Plaintiff for his ADA complaint and that all three of Plaintiff's claims for retaliatory discharge under state law must be dismissed because there is no evidence that Plaintiff's termination for insubordination was pretextual.

### A.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court is not required to draw every conceivable inference from the record; "mere speculation or conjecture" will not defeat a summary judgment motion. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

### B.    Count I: Discrimination On The Basis Of Race

In his complaint, Plaintiff alleged that Defendant discriminated against him on the basis of race by paying two of his "peers," both white males, "substantially more in salary than it was paying

20

him." (Pl. Compl. ¶¶ 23-26.) Plaintiff admits in his response to Defendant's motion for summary judgment that "the evidence does not substantiate [Plaintiff's] claim of race discrimination in pay," and Plaintiff did not further argue, in response to Defendant's motion, that any genuine issues of material fact exist so as to preclude summary judgment on this claim. (Plaintiff's Memorandum of Law in Response to the Defendant's Motion for Summary Judgment ("Pl. Response"), at 1.) The court therefore concludes that Plaintiff has abandoned his claim of race discrimination and grants summary judgment in Defendant's favor on Count I.

### C.    Count II: Retaliation For Complaints Of Race Discrimination

#### 1.    Alleged Retaliatory Acts That Are Time-Barred

In Count II, Plaintiff claims that Defendant retaliated against him for his complaints of race discrimination. According to Plaintiff, he first complained to Russell Pike about what he viewed as discriminatory pay in late 2000; Plaintiff claims that he voiced the same complaint to Mike Sommers several weeks later. (Pl. LR 56.1 Stmt. ¶¶ 9-10.) About three years later, on November 4, 2003, Plaintiff filed a charge of race discrimination with the IDHR and EEOC. (Def. LR 56.1 Stmt. ¶ 70; 11/4/03 IDHR Charge.) According to Plaintiff, it is Defendant's conduct in the aftermath of these complaints that constitutes retaliation.[28] In moving for summary judgment, Defendant contends that any claim of retaliation based on an adverse employment action taken more than 300 days before Plaintiff filed his EEOC charge on November 4, 2003 is time-barred; Defendant also argues that Plaintiff's claim that he was subjected to an adverse employment action in the form of a demotion after his filing of his EEOC charge has no basis in fact. (Defendant the Foster Group's

---

[28]    The court notes that Plaintiff filed a second charge of discrimination with the IDHR and EEOC on June 23, 2004, just two days before Plaintiff's termination. (Def. LR 56.1 Stmt. ¶ 81; 6/23/04 IDHR Charge.) At no point in his complaint, his brief, or his factual materials does Plaintiff argue that his termination was in retaliation for the filing of this June 23, 2004 charge or that Defendant had knowledge that he had filed the June 23, 2004 charge at the time of his termination. Rather, Plaintiff consistently connects his termination and all other alleged retaliatory actions to either his complaints of discrimination in late 2000 or his November 2003 EEOC filing; thus, the court does not consider Plaintiff's June 2004 EEOC filing here.

Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiff's Third-Amended Complaint ("Def. Mem."), at 7-8.)  For the reasons explained below, the court concludes that Defendant is entitled to summary judgment on Count II.

In Illinois, a Plaintiff must file a charge of discrimination or retaliation with the EEOC within 300 days of the "'alleged unlawful employment practice.'"  *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)(1)); *see Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (concluding that a plaintiff alleging that he suffered from numerous retaliatory acts can only bring action on incidents that took place "within the timely filing period").  This 300-day period begins when "the defendant has taken the action that injures the plaintiff and when the plaintiff knows [he] has been injured . . . not when [he] determines that the injury was unlawful."  *Sharp*, 236 F.3d at 372 (internal quotations and citations omitted).  In this case, Defendant is therefore correct that, to the extent Plaintiff's retaliation claim is based on adverse employment acts that occurred more than 300 days before Plaintiff filed his EEOC complaint (that is, acts that occurred earlier than January 2003), the court cannot consider those acts as a part of Plaintiff's retaliation claim.  This includes any of the various demotions in, reassignments of and changes to Plaintiff's duties between 2000 and 2002, which Plaintiff alleged as retaliatory acts in his Third Amended Complaint.  (*See* Third Am. Compl. ¶¶ 53-60.)

Plaintiff does not dispute that he may not recover damages for those alleged wrongs that occurred between 2000 and 2002, but he nevertheless argues that they are admissible to "show a series of retaliatory actions between Anderson's complaint of discrimination in 2001 and his firing in June 2004," which, according to Plaintiff, is necessary to prove causation given that "the firing occurred long after his initial complaint of discrimination to Mike Sommers."  (Pl. Response at 12.) Plaintiff cites no case law to support its position, and the court disagrees with Plaintiff as to the relevance of these acts that occurred outside the timely filing period.  Plaintiff filed a complaint of race discrimination with the EEOC in November 2003, which is much closer, temporally speaking,

to his June 2004 termination than is Plaintiff's complaint of race discrimination to Pike and Sommers in late 2000; thus, consideration of these events that took place years earlier adds nothing to the analysis of whether Plaintiff's 2004 firing was retaliatory.

## 2.    *Prima Facie* Case

A plaintiff may establish retaliation for complaints of race discrimination under the direct method or the indirect method, as set forth in *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002). To establish a *prima facie* case of retaliation under the direct method, a plaintiff must "present direct evidence . . . that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains," *id.* at 644, or circumstantial evidence that would allow the "jury to infer intentional discrimination by the decision-maker." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) (citing *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). The indirect method requires a plaintiff to show that "(1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse employment action;[29] and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (citing *Stone*, 281 F.3d at 644; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456. 466 (7th Cir. 2002)). If the plaintiff cannot satisfy any one element of the *prima facie* case, it is fatal to his retaliation claim. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). Under the indirect method, the plaintiff need not show any causal link between the statutorily protected activity and his subsequent treatment; rather, if the plaintiff establishes these four elements, the defendant must "come forward with a legitimate, non-invidious reason for

---

[29]    In *Burlington Northern and Santa Fe Railway Company v. White*, 126 S.Ct. 2405 (2006), the Supreme Court clarified that an "adverse employment action" may be more broadly understood for purposes of a Title VII claim for retaliation. *Id.* at 2415. The court explains the *Burlington Northern* standard in more detail in the discussion that follows.

the adverse employment action." *Haywood*, 323 F.3d at 531. If the defendant presents a legitimate, non-invidious reason for the adverse employment action, the plaintiff has the burden to show that the defendant's reason is pretextual. *Id.*

After setting aside those allegedly retaliatory acts that occurred outside of the timely filing period,[30] Plaintiff's retaliation claim is substantially narrowed. The court focuses here on Plaintiff's claim that he was retaliated against when, after he filed his EEOC charge of discrimination in November 2003, he was assigned to sit in an office in the help-desk area, to work at the Cook County Jail, and to work at the juvenile center, which had its own desktop staff, all of which Plaintiff views as signifying a demotion. (Pl. Response at 12.) The court must also consider whether summary judgment is appropriate on Plaintiff's claim that his June 2004 dismissal was in retaliation for his filing of a complaint of discrimination with the EEOC in November 2003. (*Id.* at 8.)

In this case, Plaintiff does not present evidence—direct or circumstantial—that is sufficient to establish a claim of retaliation under the direct method. The court will therefore consider Plaintiff's claims under the indirect method. The parties do not discuss the first two elements of the indirect method—whether Plaintiff engaged in a statutorily protected activity and whether Plaintiff's job performance met his employer's legitimate expectations. It is plain that Plaintiff engaged in a statutorily protected activity when he filed a charge of discrimination with the EEOC, and, because Plaintiff's claim fails on other grounds as described below, the court will assume for analytical purposes that Plaintiff was meeting Defendant's legitimate expectations.

---

[30]    In Plaintiff's response to Defendant's motion to dismiss, Plaintiff argues at length that a dispute of fact exists as to whether Defendant demoted Plaintiff sometime after he was hired as a Senior Consultant. (Pl. Response at 8-11.) In Plaintiff's view, a demotion occurred because Plaintiff was hired as a Senior Consultant, promoted to Manager, and then demoted back to a Senior Consultant position and was no longer supervising employees as early as late 2001 or early 2002. (*Id.* at 9-11.) But if such a demotion did occur, the undisputed facts establish that it occurred prior to 2003; Plaintiff's Staff Evaluation Form in 2001 listed him as a Manager but the 2002 form listed him as a Senior Consultant. (10/17/01 Staff Evaluation Form; 11/22/02 Staff Evaluation Form.) Because this demotion occurred, if at all, prior to 2003, the court need not address the existence of a dispute of fact related to this claimed demotion.

As for the third element of the Plaintiff's *prima facie* case, Defendant argues that there is no evidence in the record that Plaintiff was subjected to an adverse employment action. (Def. Mem. at 8.) An adverse employment action is one that "materially alter[s] the terms and conditions of employment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (citing *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001)). *Burlington Northern and Santa Fe Railway Company* explains, however, that for purposes of a Title VII retaliation claim, the challenged action need only be one that a "reasonable employee would have found [to be] materially adverse," which means that the challenged action would have dissuaded a reasonable worker from making a charge of discrimination. *Burlington N. & Santa Fe Ry. Co.*, 126 S.Ct. 2405, 2415 (2006). The court therefore considers whether the evidence is sufficient to show that the allegedly retaliatory acts that occurred within the timely filing period—Plaintiff's assignment to sit in the help-desk area, assignments to work at the Cook County Jail and the juvenile center, and June 2004 dismissal—would have dissuaded a reasonable worker from filing a charge.

First, the help-desk assignment: It is undisputed that while Plaintiff was on leave, his office and others were reassigned, and that Plaintiff was temporarily assigned to a cubicle in the help desk area after his return. (Def. LR 56.1 Stmt. ¶¶ 63-64.) Though it is not clear for exactly how long Plaintiff sat in this cubicle, this question of fact is not material, as it remains undisputed that Plaintiff eventually moved into an office beside that of Maria Strandquist, a Senior Consultant. (*Id.* ¶ 64.) Notably, although his office was situated in the help desk area, Plaintiff admits that "he did not do help desk work." (Pl. LR 56.1 Resp. ¶ 61.) Plaintiff presents no factual basis for the conclusion that this temporary assignment to a cubicle altered the "terms or conditions" of his employment in a material way, nor any evidence that a reasonable employee would find it to be materially adverse. *Compare Burlington N. & Santa Fe Ry. Co.*, 126 S.Ct. at 2417 (reasonable jury could conclude that "complete reassignment of responsibilities would have been materially adverse to a reasonable employee"); *Tart v. Ill. Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004) (reasonable

jury could conclude that reassignment that deprived employees of supervisory status, independence, opportunity to work indoors, computer access, and ability to perform skilled labor was materially adverse).

Plaintiff also contends that his assignments to work at the Cook County Jail and to work at the juvenile center, which had its own desktop staff, raise "a genuine issue as to whether [Defendant] retaliated against [Plaintiff] by gradually eroding his duties." (Pl. Response at 12.) The fact that Winslow Redmond had worked at the juvenile center casts doubt on Plaintiff's suggestion that this assignment was materially adverse, but the court need not address the matter; though Plaintiff may have been aware of an impending assignment to the Juvenile Center, Plaintiff admits that he was terminated before his work there commenced. (Def. LR 56.1 Stmt. ¶ 75.) Thus, the court cannot determine whether such an assignment, had it materialized, would have constituted an "erosion" of his duties or would otherwise be an assignment that a reasonable employee would have found to be materially adverse.

Plaintiff did in fact work at the Cook County Jail "not more than one day a week," (Pl. LR 56.1 Stmt. ¶ 33; Def. LR 56.1 Resp. ¶ 33; O'Neal Dep. at 109), beginning in May 2004, but he offers no evidence that this assignment changed the terms and conditions of his employment in a material way, either. Even assuming, in Plaintiff's favor, that he worked at the jail one day every week and had nothing to do there, the assignment comprised only a fraction of Plaintiff's work duties for a few weeks (from May 2004 until his termination in June of that year). As the Supreme Court stated in *Burlington Northern and Santa Fe Railway Company*, "reassignment of job duties is not automatically actionable," and whether a certain reassignment is actionable depends on the circumstances of the particular case. *Burlington N. & Santa Fe Ry. Co.*, 126 S.Ct. at 2417. The plaintiff in *Burlington Northern and Santa Fe Railway Company,* a forklift operator, objected to the fact that she was taken off forklift duty entirely and reassigned to perform "only standard track

laborer tracks," a more arduous and dirtier job. *Id.* at 2409.[31] The circumstances in this case are quite different, as Plaintiff's reassignment affected a fraction of his time for a very short period.

That Plaintiff may personally have found the jail assignment demeaning is not sufficient. *See Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994) (personal perception that a job assignment was "personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action."); *see also Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (plaintiff's idiosyncratic preference for one job over another does "not justify trundling out the heavy artillery of federal antidiscrimination law"). Rather than rely on his own personal preferences, Plaintiff must show that a "reasonable employee" would have found this temporary, one-day-per-week reassignment to be materially adverse. *Burlington N. & Santa Fe Ry. Co.*, 126 S.Ct. at 2415. Plaintiff has failed to do so. Nor has he offered any evidence that the brief temporary jail assignment eroded his job duties, (Pl. Response at 12) or impacted his career prospects. *See O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004) (speculation that reassignment affected employee's chance of promotion or reputation within the office insufficient to defeat motion for summary judgment). There is thus no evidence that temporarily assigning Plaintiff to work at the jail was materially adverse.[32]

---

[31] The court in *Burlington Northern and Santa Fe Railway Company* also found that the plaintiff suffered from a materially adverse action when she was suspended for thirty-seven days without pay, a suspension that was later determined to be unjustified. 126 S.Ct. at 2417-18. Although the plaintiff was subsequently given the appropriate backpay, the court concluded that a month without a paycheck constituted a serious hardship that could deter a reasonable employee from filing a complaint of discrimination. *Id.*

[32] Notably, a finding in Plaintiff's favor on this issue would not preclude summary judgment on the jail assignment/retaliation claim. Although neither party has specifically addressed the matter, proof of a *prima facie* case pursuant to the "indirect method" ordinarily requires a showing that Plaintiff was "treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *See Haywood*, 323 F.3d at 531 (citing *Stone*, 281 F.3d at 644). Plaintiff identifies no other employee treated more favorably than he. Nor has he offered any evidence that the reasons articulated by Defendant for the Cook County Jail assignment–that he had time available and Cook County personnel had asked for assistance–were pretextual.

That leaves Plaintiff's June 2004 termination. His job loss readily qualifies as an adverse employment action. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (stating that Plaintiff's firing, which occurred four months after Plaintiff filed an EEOC complaint, "clearly constituted a materially adverse action"). As Defendant has not challenged Plaintiff's *prima facie* showing with respect to the termination claim, the court turns to Defendant's articulated reason for that action.

### 3.     Defendant's Stated Reason For Termination

Defendant has come forward "with a legitimate, non-invidious reason" for Plaintiff's June 2004 termination. *See Haywood*, 323 F.3d at 531. According to Defendant, Plaintiff was terminated for his insubordinate conduct. (Def. Mem. at 11.) It is well-established that an employee's insubordinate behavior is justification for termination. *See Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) ("We have consistently held that an employee's insubordination . . . is justification for termination."). The facts surrounding Plaintiff's conduct are not in dispute: Plaintiff admits that when his supervisor, O'Neal, called him on June 25, 2004, he hung up on O'Neal and later refused O'Neal's request that Plaintiff meet with him. (Def. LR 56.1 Stmt. ¶ 84; Pl. LR 56.1 Resp. ¶ 86.) The Separation Notice formally terminating Plaintiff cites "insubordination" as the reason for his termination. (Def. LR 56.1 Stmt. ¶ 4; 6/25/04 Separation Notice.)

In order to succeed on his retaliation claim, Plaintiff has the burden to show that Defendant's stated reason for Plaintiff's termination was pretextual. *See Haywood*, 323 F.3d at 531. To establish pretext, it is not sufficient for Plaintiff to show that Defendant's decision was "'mistaken, ill considered or foolish.'" *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)). Pretext "'means a dishonest explanation, a lie rather than an oddity or an error,'" and if Defendant honestly believed the reason it offered for Plaintiff's termination, Plaintiff cannot establish pretext. *See Ballance*, 424 F.3d at 617 (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). Based on the

undisputed facts, the court concludes that Plaintiff cannot establish pretext here.[33]

According to Plaintiff, there is a genuine issue as to whether Plaintiff's termination was truly for insubordination "because similarly situated employees failed to attend mandatory staff meetings but they were not fired." (Pl. Response at 27.) Defendant does not dispute that other employees were often absent from monthly mandatory staff meetings and were not disciplined. (Pl. LR 56.1 Stmt. ¶ 85; Def. LR 56.1 Stmt. ¶ 85.) Instead, Defendant asserts that Plaintiff's act of insubordination, which occurred in response to a direct and specific request from his supervisor, is not comparable to the failure of other employees to attend reoccurring group meetings.[34] (*See* Def. SJ Reply at 9-11.) Pike testified that Plaintiff was fired only for the insubordination that occurred on June 25, 2004, (Pike Dep. at 14-16), but the court notes that the record reflects a number of incidents prior to June 25, 2004 during which Plaintiff expressed his reluctance to obey the orders of his superiors. Such incidents prompted Defendant to remind Plaintiff that he was required to "take direction from the company's management personnel with respect to performing various duties, tasks, assignments, etc." and that "[i]t is considered an act of insubordination for an employee to refuse direction provided by management of The Foster Group . . . ." (3/3/04 Letter.) Despite this reminder, on April 28, 2004, Plaintiff wrote an e-mail message to his superior, O'Neal,

---

[33]     In his response brief, Plaintiff cites to testimony that he did not include in his statement of material facts and that was not included in Defendant's statement of material facts to argue that Defendant's reason for firing Plaintiff was pretextual. For example, Plaintiff cites for the first time testimony of Russell Pike that purportedly states that Pike was not aware of Plaintiff's prior acts of insubordination when he fired him and testimony of Kevin Lane discussing Defendant's progressive discipline policy. (Pl. Response at 29-30.) Because Plaintiff did not previously set forth such testimony so as to give Defendant a chance to dispute it, the court declines to consider it here. In any case, the fact, if proven, that Pike believed the incident involving O'Neal was Plaintiff's first offense does not establish that insubordination was not the true reason for Plaintiff's discharge.

[34]     In his statement of material facts, Plaintiff submitted facts related to a single instance where another employee, Haitao Yao, allegedly refused to meet with his supervisor (Plaintiff himself). (Pl. LR 56.1 Stmt. ¶ 88.) But Plaintiff supported this fact statement only by a statement in his affidavit, which the court struck as hearsay in its order dated March 30, 2007. He does discuss the incident in greater detail in his brief, but the court declines to consider facts not set forth in the parties' statements of material facts and supported by record evidence.

announcing that he would "do as [O'Neal says] as long as [he doesn't] give [Plaintiff] any instruction's [sic] on how to handle this users project." (4/20/04 E-mails; Def. LR 56.1 Stmt. ¶ 74.) In arguing that a written warning or suspension may have been more appropriate than a termination, (Pl. Response at 30), Plaintiff neglects to acknowledge that Defendant had already warned Plaintiff that he needed to obey his superiors in the March 3, 2004 letter, and that Pike also met with Plaintiff in person to go over that letter "paragraph by paragraph." (Def. LR 56.1 Resp. ¶ 87.)

Plaintiff's remaining pretext argument focuses on an episode in 2002 in which he claims that Yao disobeyed Plaintiff's directive that he was not to work on the servers at certain times, but was not disciplined for this insubordination. (Pl. Response. at 30.) This comparison does not give the court reason to believe that Defendant's explanation for Plaintiff's termination is dishonest: First, the incident involving Yao occurred a number of years before Plaintiff's own insubordinate conduct. Further, as noted earlier, it is not clear that Yao, who holds two master's degrees, was subordinate to Plaintiff, a high school graduate, or under any obligation to follow Plaintiff's directive; instead, Yao was, at that time, supervised by Kevin Lane, who was uninvolved in Plaintiff's termination. Finally, Yao's conduct in failing to follow a directive about when to complete certain work is less severe than Plaintiff's act of hanging up the phone on and refusing to meet with his supervisor. The undisputed facts do not support that Defendant's explanation for Plaintiff's termination—that Plaintiff was insubordinate—was pretext. Defendant is entitled summary judgment on Count II.

### D.    Count III: Discrimination on the Basis of Disability

In Count III, Plaintiff claims that Defendant discriminated against him by placing him on an involuntary leave of absence, and by failing to accommodate his claimed disability, a herniated disc in his back. Defendant argues that Plaintiff did not suffer from a disability within the meaning of the ADA because his impairment was not sufficiently severe or long-term in its impact to qualify as a disability under the ADA. (Def. Mem. at 9.) Defendant further argues that as of July 2003, when

Plaintiff was put on a leave of absence, he was unable to perform the essential functions of his position with or without accommodation, and that there was no reasonable accommodation available other than to place Plaintiff on medical leave. (*Id.* at 10-11.) Finally, Defendant contends that Plaintiff cannot properly argue that Defendant perceived him to have a disability where Plaintiff did not raise such an argument in any of his charges of discrimination, and that, in any event, Plaintiff cannot establish that Defendant had such a perception. (Defendant the Foster Group's Reply Memorandum of Law in Support of Its Motion for Summary Judgment on Plaintiff's Third-Amended Complaint ("Def. Reply"), at 8.)

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show "(1) that [he] suffers from a disability as defined in the statutes; (2) that [he] is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that [he] has suffered an adverse employment action as a result of [his] disability." *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). In addition to claiming that he was discriminated against on account of his disability by being forced to take a leave of absence, Plaintiff also claims that Defendant failed to accommodate his disability; discrimination under the ADA includes the failure of an employer to make reasonable accommodations to the known physical or mental limitations of an employee. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796-97 (7th Cir. 2005). To establish a discrimination claim based on a failure to accommodate, a plaintiff must show that he is a qualified individual with a disability under the ADA, that the employer was aware of his disability, and that "the employer failed to reasonably accommodate the disability." *See id.* at 797 (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)). Thus, as a first step to any discrimination claim under the ADA, Plaintiff must be able to prove that he had a disability within the meaning of the ADA.

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or

(C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff argues that he was disabled under the ADA during the time he was employed by Defendant because he had "a physical or mental impairment that substantially limit[ed] one or more major life activities," and because Defendant "regarded [him] as having such an impairment." *Id.* The court turns first to whether Plaintiff was actually disabled under Section A of 42 U.S.C. § 12102(2) as a result of his herniated disc.

### 1. Whether Plaintiff's Herniated Disc Substantially Limited A Major Life Activity

Plaintiff was "substantially limited" if his impairment rendered him "unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Sears, Roebuck & Co.*, 417 F.3d at 798 (citing 29 C.F.R. § 1630.2(j)(1)). In deciding whether Plaintiff was disabled, this court will consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) "'[t]he permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002) (quoting 29 C.F.R. § 1630.2(j)(2)(I)-(iii)). Because Plaintiff contends that he was limited in the major life activity of "working, the statutory phrase 'substantially limits' requires, at a minimum, that [Plaintiff was] unable to work in a broad class of jobs." *Toyota Motor Mfg.*, 534 U.S. at 200. Thus, to be substantially limited in the major daily life activity of "working," Plaintiff must have been precluded from more than just one type of job or his particular job of choice. *Id.*; *Burnett v. LFW Inc.*, 472 F.3d 471, 484 (7th Cir. 2006) (citing 29 C.F.R. § 1630.2(j)(3)(I)) (the inability to perform a particular job does not constitute a substantial limitation on the major life activity of "working").[35]

---

[35] Significantly, Plaintiff himself has not identified any major life activity that was affected by his herniated disc. Because Plaintiff does state his belief that Defendant perceived his
(continued...)

It is undisputed that Plaintiff's herniated disc caused him acute low back pain with pain radiating down his legs to his feet. (Pl. LR 56.1 Stmt. ¶ 43.) Plaintiff's herniated disc thus undoubtedly resulted in symptoms that were quite painful to him. The record, nevertheless, does not support the conclusion that his impairment was severe. As of July 2003, Plaintiff's doctor restricted him from lifting more than five pounds at a time, and he could not stand for more than fifteen minutes at one time or more than twenty minutes in an hour, (Def. LR 56.1 Stmt. ¶ 42; 7/25/03 Letter from Sunil Patel, M.D.); but by October 2003, Plaintiff's only limitation was that he could not lift more than 40 pounds. (Def. LR 56.1 Stmt. ¶ 56.) Thus, Plaintiff's limitations became much less restrictive in just three months. Plaintiff contends that the restrictions on his lifting and standing "raise a genuine issue as to whether his condition was severe enough to qualify as a disability," (Pl. Response at 14-15), but none of the facts regarding Plaintiff's limitations are in dispute.

Plaintiff also believes that the severity of his condition is demonstrated by the facts that Plaintiff required physical therapy two to three times a week beginning in September 2003 and was considering surgery for his herniated disc when he saw Dr. Patel in July 2003. (Pl. Response at 15; Pl. LR 56.1 Stmt. ¶ 55.) It is undisputed, however, that Plaintiff's impairment improved thereafter: Plaintiff admits that his condition improved with physical therapy, (Pl. LR 56.1 Resp. ¶ 58), and that he was continuing his course of physical therapy even after his lifting restriction was changed to 40 pounds in October 2003. (Pl. LR 56.1 Stmt. ¶ 61.) Because the physical therapy

---

[35](...continued)
disability as affecting the major life activity of "working," the court assumes that it is Plaintiff's position that "working" was the major life activity affected by his herniated disc. (*See* Pl. Response at 16.) The Supreme Court has voiced some reservations about whether "working" is a major life activity under the ADA, *see Toyota Motor Mfg.*, 534 U.S. at 200, but the Seventh Circuit has considered "working" a major life activity and Defendant does not argue otherwise here. *See EEOC v. Schneider National, Inc.*, 481 F.3d 507 (7th Cir. 2007) (observing that "the EEOC believes" that working is a major life activity, "but the Supreme Court has its doubts"); *Kupstas v. City of Greenwood*, 298 F.3d 609, 612 (7th Cir. 2005).

treatment was having a positive impact on Plaintiff's condition, his need for therapy or any other treatment does not constitute evidence of the severity of Plaintiff's condition. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999) (in determining whether a person is "substantially limited in a major life activity," the court may consider measures that a person is taking to mitigate a physical impairment and the positive or negative consequences of those measures).

As for the duration of Plaintiff's disability, Defendant argues that it was "brief." (Def. Mem. at 9.) Plaintiff, on the other hand, contends that it lasted for at least one year and continues to the present day. (Pl. Response at 13-14.) Plaintiff notes that he first developed back pain in October 2002, (Pl. LR 56.1 Stmt. ¶ 41), he was diagnosed with a herniated disc in January 2003, (Pl. LR 56.1 Stmt. ¶ 44), and he continued to suffer from symptoms from his herniated disc until he left. (Pl. LR 56.1 Stmt. ¶ 69 (indicating that Plaintiff was still suffering from symptoms from his herniated disc in January 2004).) But the fact that Plaintiff was experiencing *symptoms* from his herniated disc for more than a year does not mean that he was suffering from a disability, within the meaning of the ADA, for that same time period. "Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. pt. 1630 app., § 1630.2(j); *see also Toyota Motor Mfg.*, 534 U.S. at 198 (citing 29 CFR §§ 1630.2(j)(2)(ii)-(iii)) (impairment must substantially limit daily activity permanently or for a long term).

The time period in which Plaintiff's herniated disc caused him significant *limitations* was in fact brief. As stated above, his five-pound lifting restriction and fifteen-minute standing restriction was imposed in July 2003, (Def. LR 56.1 Stmt. ¶ 42; 7/25/03 Letter from Sunil Patel, M.D.); but, by October 2003, Plaintiff's only limitation was that he could not lift more than 40 pounds. (Def. LR 56.1 Stmt. ¶ 56.) Thus, by October 2003, Plaintiff's limitations did not compromise his ability to work. None of the equipment Plaintiff was required to lift exceeded his 40-pound weight restriction. There are no disputes of fact material to this determination: The parties agree that monitors weighed twelve pounds, PC's weighed from ten pounds to fifteen pounds, and printers weighed

close to thirty-two pounds.  (*Id.* ¶ 44.)  Because Plaintiff's impairment was not severe and affected his ability to work for no more than a short period, the court concludes that Plaintiff cannot prove that his herniated disc constituted "a physical or mental impairment that substantially limit[ed] one or more of [his] major life activities."  42 U.S.C. § 12102(2).

### 2.      Whether Defendant Regarded Plaintiff As Disabled

Even if Plaintiff's condition was not severe enough or of sufficient duration to qualify as a disability, Plaintiff argues that "there is evidence sufficient to raise a genuine issue as to whether [Defendant] perceived" that Plaintiff was disabled.  (Pl. Response at 16.)  Defendant argues, first, that Plaintiff may not pursue a claim of perceived disability because that theory was not presented in his EEOC charge.  Nor would such a theory have substantive merit, in Defendant's view.  The fact that Defendant "forced" Plaintiff to take a leave of absence would not, by itself, establish that Defendant perceived Plaintiff as disabled within the meaning of the ADA.  (Def. Reply at 8.)

The court turns, first, to the procedural objection.  Defendant correctly observes that an employee who files a discrimination claim in federal court may not raise claims that were not included in the employee's EEOC charge.  *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).  The employee need not allege every fact or claim that forms the basis of his complaint in an administrative complaint "with relentless specificity," however, *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992); rather, a claim of discrimination is proper as long as it is "like or reasonably related" to the allegations in the administrative charge and "[grows] out of such allegations."  *Cheek*, 31 F.3d at 500 (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 528 F.2d 164, 167 (7th Cir. 1976)) (internal quotations omitted).  "The EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals.*" *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995) (quoting *Cheek*, 31 F.3d at 501) (emphasis in original).

Plaintiff argues in response to Defendant's motion for summary judgment that Defendant forced him to take a leave of absence, and that this is evidence that Defendant regarded him as

disabled. This argument is reasonably related to and grows directly out of the facts Plaintiff stated in his November 4, 2003 EEOC charge, namely that Defendant was aware of his disability, that Defendant "forced" him to take a three-month leave of absence, and that Defendant had discriminated against Plaintiff on the basis of a disability. (*See* 11/4/03 IDHR Charge.) While Plaintiff's EEOC charge does not mimic the language of the ADA and state specifically that Defendant "regarded [him] as" disabled, such "relentless specificity" is not required, particularly given that most EEOC charges are completed by laypersons and not lawyers. *See Cheek*, 31 F.3d at 500 (noting that most EEOC charges are not completed by lawyers); *see also Smith v. Warren R. Gregory & Sons, Inc.*, No. IP99-1490–C-B/S, 2001 WL 1691640, \*\*5-6 (S.D. Ind. Nov. 21, 2001) (allowing plaintiff to argue that employer "regarded [him] as disabled" despite "bare-bones" EEOC charge because (1) EEOC charge contained factual basis for plaintiff to claim his employer regarded him as disabled, and (2) allegation in EEOC charge that plaintiff had been treated unfavorably based on disability triggered inquiry into various definitions of disabled, including the "regarded as" definition); *Baker v. Chicago Park Dist.*, No. 98-C-4613, 1999 WL 519064, \*5 (N.D. Ill. July 15, 1999) (finding plaintiff's claim that employer perceived him to have a disability, which was not asserted in plaintiff's EEOC charge, to be reasonably related to plaintiff's claim that he was actually disabled under the ADA) (collecting cases). Defendant's procedural objection to Plaintiff's perceived disability claim is overruled.

Plaintiff can prevail on the merits of such a claim if he can show that his employer believed that he had a "substantially limiting impairment" that he did not in fact have, or that the employer believed he had a "substantially limiting impairment" when, in fact, the impairment is not so limiting. *Sutton*, 527 U.S. at 489. Only the latter approach is applicable in this case as it is undisputed that Plaintiff suffered from a herniated disc and there is no evidence that Defendant regarded Plaintiff as having any other impairment.

The undisputed facts defeat Plaintiff's theory that Defendant misconstrued his physical

condition. There is no evidence that Defendant mistakenly believed that Plaintiff's physical impairment of a herniated disc substantially limited Plaintiff in his major life activity of working—in other words, that Plaintiff was substantially limited from working in a broad class of jobs. *See Toyota Motor Mfg.*, 534 U.S. at 200 (stating that a plaintiff must be "unable to work in a broad class of jobs" to be "substantially limited" in the major life activity of "working"). In fact, the evidence supports the contrary conclusion: Defendant was aware that Plaintiff's herniated disc impaired his ability to work in his particular job for a brief amount of time. Russell Pike, Defendant's Chief Operating Officer, did not believe that Plaintiff could perform his responsibilities with the five-pound limitation imposed by Dr. Patel in July 2003, (Def. LR 56.1 Stmt. ¶ 48; Pike Dep. at 151), but this five-pound limitation was eliminated in a matter of just three months. As the court has already explained, the 40-pound restriction imposed at the time of his return to work in October 2003 limitation would not have prevented him from performing any of the lifting duties that he performed prior to his leave of absence. Moreover, Plaintiff has presented no evidence that any of Plaintiff's supervisors believed that physical limitations prevented him from successfully completing his job duties in any way after he returned to work.

Plaintiff nevertheless contends that the fact that Defendant forced him to take a leave of absence in the first place indicates that Defendant perceived him as having a disability that affected the major life activity of working. (Pl. Response at 16.) There is evidence that Plaintiff was unwilling to take a leave in July 2003 and that Defendant insisted he do so. It is, however, undisputed that at the time Plaintiff's leave of absence commenced, Defendant expected him to recover and return to work. In a July 28, 2003 letter, Mike Sommers wrote to Plaintiff that Defendant "must insist that [he] take an unpaid leave until [his] health issues, as documented by Dr. Patel, have been completely resolved." (Pl. LR 56.1 Stmt. ¶ 53; 7/28/03 Letter.) Sommers further explained that the "restrictions indicated [would] prevent [Plaintiff] from adequately performing [his] day-to-day job responsibilities and furthermore, the nature of [his] work could

jeopardize and/or hinder [his] full recovery."  (7/28/03 Letter.)  Because Plaintiff does not dispute that Defendant believed a full recovery was possible, Plaintiff also cannot establish that Defendant regarded his herniated disc as a condition that would substantially limit him in a broad class of jobs.

Plaintiff cites *Medlin v. Rome Strip Steel Co.*, 294 F. Supp. 2d 279 (N.D.N.Y. 2003), in support of his argument that Defendant's insistence that he take a leave of absence establishes that Defendant perceived him as having a disability.  (Pl. Response at 16-17.)  *Medlin* is not binding on this court and is readily distinguishable.  As in this case, the plaintiff in *Medlin* argued that his employer regarded him as substantially limited in the major life activity of working.  294 F. Supp. 2d at 290.  In finding a dispute of fact on this issue, the court did not rely on the fact that Medlin's employer allowed him to take a leave of absence or ordered him to take a "functional capacity evaluation."  Instead, the *Medlin* court's conclusion rested on evidence that after the plaintiff had taken his allotted leave from work, his employer issued a blanket refusal for the plaintiff to return to work in any capacity other than his previous position.  In the court's view, that refusal implied that the defendant "did not believe that plaintiff could work any job requiring the same skills, experience, and know-how as his previous position."  *Id.*  Defendant imposed no such limitations in this case.  Based on the undisputed facts, the court concludes that the Defendant did not regard Plaintiff as disabled within the meaning of the ADA.

### E.    Count IV: Retaliation For Complaint of Disability Discrimination

Even if Plaintiff was not disabled within the meaning of the ADA, as the court concluded above, Defendant is nevertheless prohibited from retaliating against him for attempting to raise a good-faith claim under the ADA; thus, the court must consider Plaintiff's claim that his June 25, 2004 firing was in retaliation for Plaintiff's complaints about Defendant's failure to accommodate his claimed disability.  *See Cassimy v. Bd. of Educ. of Rockford Pub. Sch. Dist. 205*, 461 F.3d 932, 938 (7th Cir. 2006).

The ADA provision that forbids an employer to retaliate against an employee for statutorily

protected activities is materially identical to the provision of Title VII that prohibits retaliation. *See Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003); *see also Cassimy*, 461 F.3d at 938 (applying Title VII framework to claim of retaliation for complaint of disability discrimination). Like his Title VII retaliation claim in Count II, Plaintiff may prove his claim of retaliation in violation of the ADA via direct or indirect evidence. *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). Under the direct approach, a plaintiff must present evidence that he engaged in a statutorily protected activity, that he suffered from an adverse action, and that there is a causal connection between the two. *Id.* (citations omitted). Under the indirect approach, Plaintiff must establish: "(1) that [he] engaged in protected activity; (2) that [he] was subject to an adverse employment action; (3) that [he] was performing [his] job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action." *Id.* (citing *Stone*, 281 F.3d at 644). If the plaintiff can establish these *prima facie* elements, the employer may present evidence of a non-invidious reason for the adverse employment action; if the employer does so, the employee has the burden to demonstrate that the employer's proffered reason is pretextual. *Cassimy*, 461 F.3d at 938 (citing *Hudson*, 375 F.3d at 559). As Plaintiff has not explained whether he proceeds here under the direct or indirect method, the court considers both.

The parties do not dispute that Plaintiff engaged in a statutorily protected activity by complaining that Defendant failed to accommodate Plaintiff's alleged disability. *See Burks*, 464 F.3d at 758 ("A complaint about . . . disability discrimination to supervisors is a protected activity."). It is also undisputed that Plaintiff suffered from an adverse employment action. *Id.* ("[T]ermination is certainly an adverse action.") Under the direct method, Plaintiff must present evidence of a causal connection between his complaints of disability discrimination and his termination; put another way, Plaintiff must offer evidence that Defendant would not have terminated him "but for" his complaint of disability discrimination. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904 (7th Cir. 2005) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (stating that

plaintiff needed to show "that [the defendant] would not have taken the adverse employment action 'but for' her protected activity" to prove causation under the direct method). Defendant argues that there is no evidence that Plaintiff's termination had any connection to his complaint about Defendant's alleged failure to accommodate his herniated disc. (Def. Mem. at 11-12.)[36]

As with his Title VII retaliation claim, Plaintiff emphasizes the fact that his June 25, 2004 firing occurred shortly after he complained about disability discrimination: He notes the "short, three-month time span between [his] complaint and the firing, along with subsequent demeaning, empty assignments to work in the county jail and the juvenile center" and argues that "there is a genuine issue" as to whether he was fired because of his complaint of disability discrimination. (Pl. Response at 24-25.) Plaintiff's reference to a three-month time span between his complaint of disability discrimination and his termination indicates he views the relevant complaint of discrimination as his March 2004 complaint to Dan Howard that he was being forced to work a schedule that would prevent him from getting physical therapy for his back condition. (Pl. LR 56.1 Stmt. ¶ 25; Pl. Aff. ¶¶ 24, 28.) In addition, the court notes that he complained of disability discrimination in a May 5, 2004 e-mail to Sommers, Howard, and Pike, in which he characterized Defendant's attempt to change his work schedule as evidence that Defendant was not accommodating his disability. (5/5/04 E-mail.) Even the shorter time period between Plaintiff's May 5, 2004 complaint of disability discrimination and his June 25 termination is not, standing alone, sufficient to establish causation, however: "[S]uspicious timing alone rarely is sufficient to create a triable issue" of fact on summary judgment. *Tomanovich*, F.3d at 665 (quoting *Moser*, 406

---

[36]     Plaintiff correctly contends in his response to Defendant's motion for summary judgment that Defendant somewhat misinterprets Plaintiff's claim in Count IV. Defendant argues that if Defendant's management had been inclined to retaliate against Plaintiff, they could have done so much sooner than nearly a year after they became aware of Plaintiff's medical condition, (Def. Mem. at 11); but, in Count IV, Plaintiff claims that Defendant retaliated against him not for his complaints of back pain but for his *complaint* that Defendant had failed to accommodate his medical condition.

F.3d at 905); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004) ("By itself, temporal proximity would not normally create an issue of material fact as to causation. . . ."). *See EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (en banc) (six-week gap between filing of EEOC charge and termination insufficient to establish retaliation and therefore affirming award summary judgment for defendant); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (one-month between employee's filing of EEOC charge and her discharge insufficient to link filing of charge to termination without other evidence). *Cf. King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir. 1999) (temporal proximity of one day between any employee's protected activity and termination sufficient to overcome a motion for summary judgment).

Plaintiff urges that he has evidence, in addition to timing, that his termination was related to his complaint of discrimination: he points to the "demeaning, empty" assignments to the Cook County Jail and the juvenile center. (Pl. Response at 24-25.) As explained in detail earlier, the assignment to the juvenile center never materialized. His assignment to the Cook County Jail did materialize, but it spanned just six weeks and consumed "not more than one day a week." In any case, this additional evidence, even when coupled with the seven-week time period between Plaintiff's complaint of disability discrimination and his termination, still does not satisfy the court that Defendant would not have terminated Plaintiff "but for" his complaint of disability discrimination. *Moser*, 406 F.3d at 904 (citing *Wells*, 289 F.3d at 1008). It is undisputed that Plaintiff acted insubordinately towards his supervisor, O'Neal, on June 25, 2004, the same day he was terminated. Given that Plaintiff's insubordination proceeded his termination by a matter of hours, Plaintiff cannot show that his complaint of disability discrimination was the "but for" cause of his termination so as to establish the causal connection that the direct method requires. *Id.*

This evidence of insubordinate behavior would defeat any effort by Plaintiff to establish that his termination was a product of retaliation under the indirect method, as well. As described above,

Plaintiff has not demonstrated that Defendant's legitimate reason for his termination—insubordination—was a pretext. (*See supra* Discussion Section C.4.) Nor has Plaintiff identified any similarly situated employees who did not complain of disability discrimination and were treated more favorably. The court grants summary judgment in Defendant's favor on Count IV.

**F.    Count VII: Retaliation for Exercise of FMLA Rights**

Plaintiff's final federal claim appears in Count VII. Without specifically invoking federal law, Plaintiff alleges there that Defendant discharged him in June 2004 in retaliation for his June 2003 complaint to the Department of Labor. The Family and Medical Leave Act prohibits retaliation against persons exercising their rights under that statute. 29 U.S.C. § 2615. To establish that his rights have been violated, Plaintiff proceeds in the same way as described earlier with respect to his Title VII and ADA retaliation claims. *See Burnett v. LFW, Inc.,* 472 F.3d 471, 481 (7th Cir. 2006).

Plaintiff's FMLA retaliation claim fails for the same reasons that his earlier retaliation claims do not survive summary judgment. Plaintiff made his complaint to the Department of Labor in June 2003. The time gap between that complaint and his June 2004 termination is significantly greater than the gap between his complaint of race discrimination (November 2003) or his complaint of disability discrimination (May 2004) and his termination. Plaintiff offers no other circumstantial evidence that it was his contact with the Department of Labor a year earlier rather than his episodes of insubordination that motivated his discharge. Nor has he offered evidence that would support his claim under the "indirect method": he identifies no similarly-situated workers treated more favorably than he, nor does he offer evidence from which the court could find that the reason articulated by Defendant for his termination was a pretext. The court grants summary judgment in favor of Defendant on Count VII.

**G.    Counts V and VI:  State Law Claims For Retaliatory Discharge**

In view of the court's finding above that Defendant is entitled to summary judgment on the federal law claims that Plaintiff raises in Counts I, II, III, IV, and VII, this court declines to exercise jurisdiction over Counts V and VI. These remaining counts involve state law claims: wrongful discharge because Plaintiff resisted and reported a fraudulent act by Defendant (Count V), and wrongful discharge in retaliation for Plaintiff's filing of a worker's compensation claim (Count VI).[37] "It is the well-established law of [the Seventh Circuit] that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001) (citing 28 U.S .C. § 1367(c)(3)) (confirming that the court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction). Nothing in the record before the court indicates that "the interests of judicial economy, convenience, fairness, or comity" counsel in favor of this federal court determining Plaintiffs' state law claims after having dismissed all federal claims. *See Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citation omitted). Thus, the court exercises its discretion to decline jurisdiction over Plaintiffs' state law claims. Counts V and VI are dismissed without prejudice.

---

[37] While the court declines to conclude whether Plaintiff's state law claims are sufficient to survive summary judgment, the court notes that in order to meet the standard for establishing a tort claim for retaliatory discharge in Illinois, a plaintiff must show (1) that he has been discharged; (2) in retaliation for his activities; and (3) that the discharge violates a clear mandate of public policy. *Bajalo v. Northwestern Univ.*, 369 Ill. App. 3d 576, 580, 860 N.E.2d 556, 559 (1st Dist. 2006) (citing *Zimmerman v. Buchheit of Sparta Inc.,* 164 Ill.2d 29, 35, 645 N.E.2d 877, 881 (1995)). Illinois courts have held that retaliation for refusal to violate a statute or law or for filing a worker's compensation claim qualify as matters of "public policy" so as to "justify a finding of 'wrongful discharge.'" *Shearson Lehman Bros., Inc. v. Hedrich*, 266 Ill. App. 3d 24, 30, 639 N.E.2d 228, 233 (1st Dist. 1994) (citing *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 128-31, 421 N.E.2d 876, 878-79 (1981); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 181, 384 N.E.2d 353, 357 (1978)).

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted as to Plaintiff's federal law claims (Counts I-IV and VII).  Plaintiff's state law claims (Counts V and VI) are dismissed without prejudice.

ENTER:

Dated: October 16, 2007

_____

REBECCA R. PALLMEYER
United States District Judge